UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL SMITH and DEBORAH SMITH, | ) | |
| | ) | |
| Plaintiffs, | ) | 17 C 8328 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| NVR, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

In this diversity suit against NVR, Inc., Paul and Deborah Smith allege that the home
NVR constructed for them did not conform to its advertised and agreed-upon specifications.
Doc. 46. On NVR's motion under Civil Rule 12(b)(6), the court dismissed some of the Smiths'
claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815
ILCS 505/1 *et seq*., but allowed two of their ICFA claims and all of their breach of contract
claims to proceed. Docs. 73-74 (reported at 2018 WL 6335051 (N.D. Ill. Dec. 5, 2018)). The
court then denied the Smiths' motion for class certification. Docs. 113-114 (reported at 2019
WL 6838938 (N.D. Ill. Dec. 16, 2019)). A jury trial is set for August 2, 2021. Doc. 180.

Before the court is NVR's motion to exclude certain opinions of the Smiths' expert,
James Collins, Doc. 145, NVR's motion for summary judgment on all of the Smiths' claims,
Doc. 146, and the Smiths' motion for partial summary judgment on two of their claims,
Doc. 149. For the reasons and to the extent set forth below, NVR's motion to exclude is granted
in part and denied in part, NVR's summary judgment motion is granted in part and denied in
part, and the Smiths' motion for partial summary judgment is denied.

## Background

### A.    Factual Background

Because the parties cross-move for summary judgment, the court must consider the facts in the light most favorable to the Smiths when considering NVR's motion and in the light most favorable to NVR when considering the Smiths' motion.  *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted).  To the extent a disputed fact relates to both sides' motions, the court will set forth the parties' respective positions.  At this juncture, the court does not vouch for either side's version of the facts.  *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

NVR, which operates under the name "Ryan Homes," builds homes.  Doc. 148 at ¶ 1; Doc. 162 at p. 1.  The Smiths purchased a home from NVR, to be constructed in the Tall Pines subdivision in Plainfield, Illinois.  Doc. 148 at ¶¶ 6-7; Doc. 151 at ¶ 2; Doc. 162 at p. 4.  The parties' contract, which they call the "Purchase Agreement," stated that it was the "entire and final Agreement" and that any "other prior or contemporaneous agreements, representations, promises or terms (written or oral)" would be superseded.  Doc. 148 at ¶¶ 8-9; Doc. 162 at p. 4.  The Agreement further provided that any "oral statements or promises" not memorialized in the contract would be unenforceable.  Doc. 148 at ¶¶ 10-11; Doc. 162 at p. 5.  Additionally, it stated that the home NVR would build might differ from what the Smiths had seen in "advertisements and marketing information."  Doc. 148 at ¶ 12; Doc. 162 at p. 5.  In particular, the Agreement granted NVR "the right to substitute similar materials of substantially equivalent quality" and "the right to make changes in the Plans and Specifications for purposes of mechanical installations, building code and site requirements, and reasonable architectural design

2

improvements." Doc. 148 at ¶ 13; Doc. 151 at ¶ 4. The Smiths paid $235,400 for the home, including the land. Doc. 148 at ¶ 16; Doc. 162 at p. 6.

After conducting several building inspections, the Village of Plainfield issued a certificate of occupancy. Doc. 148 at ¶¶ 17-18; Doc. 162 at p. 6. A dispute soon arose as to whether NVR had properly constructed the Smiths' home to its specifications. In particular, the Smiths believe that the home was deficient as to: (1) the kitchen and bathroom cabinets; (2) the roofing shingles; (3) the HVAC system; (4) the water lines; and (5) the floor framing. Doc. 46 at ¶¶ 13-27.

### 1. Cabinets

Before buying the home, the Smiths received a brochure titled "Tall Pines at Grande Park Included Features." Doc. 148 at ¶ 20; Doc. 162 at p. 7. The Included Features brochure referenced "Timberlake Honey Oak or Maple Cabinetry" as an option for the kitchen cabinets and "Timberlake Natural Oak Vanity" as an option for the bathroom cabinets. Doc. 148 at ¶ 26; Doc. 162 at p. 8. After reviewing sample cabinet doors, the Smiths opted to upgrade to "Sonoma maple espresso" kitchen and bathroom cabinets for an additional cost of $4,790. Doc. 148 at ¶¶ 28-30, 35-36; Doc. 162 at pp. 8-9, 15; Doc. 168 at ¶ 17.

The "master selection sheet" incorporated into the contract, Doc. 148 at ¶ 31; Doc. 162 at p. 8, listed the following options for kitchen cabinetry, in addition to Sonoma maple espresso: Fairfield wheat, Scottsdale maple cognac, Scottsdale maple espresso, Tahoe Cherry Bordeaux, Sonoma "PTDLIN/MPLESP," Sonoma painted linen, Rushmore maple espresso, Rushmore cherry spice, Rushmore "PTDHAZ/MPLESP," Rushmore painted glaze hazelnut, Rushmore painted linen, and Rushmore "PTDLIN/STONE." Doc. 148-1 at 152. The bathroom cabinetry options were similar. *Id*. at 152-53. The master selection sheet noted a "TBD" selection for the

cabinets, *ibid.*, and the Smiths' eventual selection of Sonoma maple espresso cabinets appeared in a document titled "Change Order Addendum to Purchase Agreement," Doc. 148 at ¶ 34; Doc. 148-1 at 157; Doc. 162 at p. 9.

Before selecting those cabinets, the Smiths discussed cabinet options with several NVR sales representatives. Doc. 162 at p. 15; Doc. 168 at ¶ 14. Paul claims that he came away from those conversations thinking that the cabinets would be made of solid maple wood. Doc. 162 at p. 15. Neither the representatives nor the brochure, however, at any time used the phrases "solid wood," "all wood," or "solid maple wood" in reference to the cabinets. Doc. 148 at ¶¶ 27, 39; Doc. 162 at pp. 8, 10.

The Sonoma maple espresso cabinets that NVR installed were not made of solid maple wood, but instead had only a wood veneer. Doc. 162 at p. 3. When construction was complete, the Smiths met with an NVR representative for a "new home orientation." Doc. 148-1 at 165. After the meeting, Paul signed a report with a checkmark indicating that the cabinets were in "good condition." Doc. 148 at ¶ 40; Doc. 148-1 at 165; Doc. 162 at p. 10.

### 2. Roofing Shingles

The Included Features brochure listed 30-year shingles as an included feature. Doc. 162 at p. 15; Doc. 168 at ¶ 16. NVR instead installed 25-year shingles on the Smiths' home. Doc. 148 at ¶ 21; Doc. 162 at p. 7. In 2019, the Tall Pines homeowners' association had the 25-year shingles replaced with 30-year shingles at no cost to the Smiths. Doc. 148 at ¶¶ 22-24; Doc. 162 at p. 7. The Smiths do not claim that this replacement was in any way related to NVR's alleged error in originally installing 25-year shingles rather than 30-year shingles.

4

### 3.  HVAC System

The model home plans did not detail the specific furnace or air conditioning condenser models that NVR would install.  Doc. 151 at ¶¶ 12-13; Doc. 160 at ¶¶ 12-13.  In May 2016, NVR submitted a "Building Summary," Doc. 151-3, to the Village for review and approval. Doc. 151 at ¶¶ 14, 16-17; Doc. 160 at ¶¶ 14, 16-17.  NVR's HVAC-related calculations suggested that it would install an 80,000-BTU furnace and a 3-ton air conditioning condenser. Doc. 151 at ¶¶ 14, 16-17, 20-21; Doc. 160 at ¶¶ 14, 16-17, 20-21.  After reviewing the submission, the Village issued a building permit.  Doc. 151 at ¶ 25; Doc. 160 at ¶ 25.

The HVAC system that NVR installed in the Smiths' home differed from the initial plans.  Doc. 151 at ¶¶ 28-30; Doc. 160 at ¶¶ 28-30.  Specifically, NVR installed a 60,000-BTU furnace rather than the 80,000-BTU model, and a 2.5-ton condenser rather than the 3-ton model. Doc. 151 at ¶¶ 31-34; Doc. 160 at ¶¶ 31-34.  NVR told Paul that the deviations resulted from new HVAC calculations that NVR's contractor had performed after submitting the "Building Summary" to the Village, and that the Village had not reviewed or approved the new calculations.  Doc. 151 at ¶¶ 37-38; Doc. 160 at ¶¶ 37-38.

### 4.  Water Lines

The parties' Local Rule 56.1 statements and responses do not provide details on the water line dispute, but the complaint alleges that the water supply lines installed by NVR have a narrower diameter than the diameter indicated in the plumbing fixture calculations approved by the Village. Doc. 46 at ¶ 24.  According to the Smiths, the narrower water lines are not of substantially equivalent quality to the wider lines.  *Ibid*.

5.      **Floor Framing**

The plans for the model of home the Smiths selected included details for the floor framing (that is, the home's structural support).  Doc. 151 at ¶ 7; Doc. 160 at ¶ 7.  Those plans were set forth in NVR's submission to the Village.  Doc. 151 at ¶ 22; Doc. 160 at ¶ 22.  The floor framing installed by NVR differed from what had been shown on the construction drawings.  Doc. 151 at ¶¶ 26-27; Doc. 160 at ¶¶ 26-27.  The details of the deviations are complex and not germane to the pending motions.

B.      **Procedural History**

The Smiths sued NVR on behalf of themselves and a putative class of similarly situated homebuyers.  Doc. 1.  The complaint asserted two counts under Illinois law, one for violating the ICFA and the other for breach of contract.  *Id*. at ¶¶ 25-33.  For convenience, this opinion treats the complaint as asserting five separate ICFA claims and five separate contract claims—one for each category of alleged construction deficiency.

The court dismissed the original complaint's ICFA claims in their entirety and its contract claims relating to the HVAC system, water lines, and floor framing.  Docs. 44-45 (reported at 2018 WL 2718038 (N.D. Ill. June 6, 2018)).  The Smiths filed an amended complaint, asserting the same two counts (*i.e.*, ten claims).  Doc. 46 at ¶¶ 37-44.  On NVR's Rule 12(b)(6) motion, the court allowed all of the contract claims to proceed, but dismissed the ICFA claims relating to the HVAC system, water lines, and floor framing.  2018 WL 6335051, at *7.  This left the following claims: (1) a contract claim and an ICFA claim as to the cabinets; (2) a contract claim and an ICFA claim as to the roofing shingles; (3) a contract claim as to the HVAC system; (4) a contract claim as to the water lines; and (5) a contract claim as to the floor framing.  As noted, the court denied the Smiths' class certification motion, so they proceed only on their own claims against NVR.

6

## Discussion

NVR moves to exclude the opinion of James Collins, the Smiths' liability and damages expert.  Doc. 145.  NVR also moves for what it calls "partial summary judgment," Doc. 146, but the motion in fact seeks summary judgment on all of the Smiths' claims.  The Smiths move for partial summary judgment on their contract claims relating to the HVAC system and floor framing.  Doc. 149.  Because NVR's summary judgment motion relies in large part on its motion to exclude, the court first resolves the latter and then the former, and then turns to the Smiths' motion for partial summary judgment.

## I.     NVR's Motion to Exclude

Casting Collins's expert report and deposition testimony as "incomplete, tentative and unreliable," as well as "lacking sufficient foundation and methodologies," NVR argues that the court should exclude his opinions under Evidence Rule 702.  Doc. 154 at 3; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-95 (1993); *Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he *Daubert* analysis applies to *all* expert testimony under Rule 702, not just scientific testimony.") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). Collins offers opinions on whether there were construction deficiencies as to the five matters described above, and also offers a range of damages, in the form of repair costs, for each deficiency.  Doc. 157-1 at 13-33.  NVR first attacks Collins's damages opinions as unreliable and therefore inadmissible.  Doc. 154 at 4-10; *see* Fed. R. Evid. 702(c)-(d).  NVR then challenges his opinions as to deficiencies in the cabinets, roofing shingles, HVAC system, and water lines (but not the floor framing), Doc. 154 at 10-14, arguing that those opinions "lack a reliable foundation and methodology," *id*. at 10; *see* Fed. R. Evid. 702(c).

### A.    Collins's Damages Opinions

NVR criticizes Collins for admitting that his damages opinions were "not stat[ed] to a reasonable degree of architectural certainty" and that his figures were "subject to further review" rather than being "final opinion[s]." Doc. 154 at 5 (quoting Doc. 154-1 at 44, 52). In NVR's view, Collins's opinions are too "tentative" and "incomplete" to be admissible. *Id*. at 5-7.

Collins's failure to put a "reasonable degree of certainty" stamp on his opinions is not fatal, as Rule 702 "does not require that an expert's opinion testimony be expressed in terms of a reasonable scientific certainty in order to be admissible." *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) (internal quotation marks omitted). An expert's lack of confidence in his opinions gives grist to a healthy cross-examination at trial, not exclusion.

NVR's contention that Collins's opinions were too tentative also misses the mark. In a portion of the deposition transcript cited by NVR, Collins merely explains that one would not know the actual cost of repairs until contractors worked up full repair plans and submitted final bids. Doc. 154-1 at 44 (cited by Doc. 154 at 5). So Collins's figures were "tentative" only in the sense that *any* preliminary estimate of a project's cost is tentative. In fact, unless the Smiths had gone ahead and repaired all the alleged construction deficiencies on their own dime—something they cannot have been expected to do—there would have been no way for them or Collins to provide a precise, final number for the repair costs.

Nor does the fact that Collins's opinions were subject to adjustment mean that they are "incomplete." Doc. 154 at 5-6. Indeed, much of the legal authority on "completeness" cited by NVR, Doc. 154 at 5-7, concerns expert disclosure obligations under Civil Rule 26(a)(2), not admissibility under Evidence Rule 702. *See*, *e.g.*, *Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) (explaining that for Rule 26(a)(2) purposes, a report must be "complete" in the sense that it must "include the substance of the testimony which an expert is

expected to give on direct examination together with the reasons therefor"); *Hard Surface Sols., Inc. v. Sherwin-Williams Co.*, 271 F.R.D. 612, 615-16 (N.D. Ill. 2010) (finding a Rule 26(a)(2) violation because it was impossible to tell from the expert report what the expert's testimony would be at trial). Collins's damages opinions are not incomplete in this sense because he has clearly stated his planned trial testimony. Again, what NVR sees as weaknesses in Collins's opinions might serve as useful lines of attack on cross-examination at trial, but they are not grounds for exclusion. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("The judge should permit the jury to weigh the strength of the expert's conclusions, provided such shortcomings are within the realm of a lay juror's understanding.").

NVR is on somewhat firmer ground in criticizing the basis for Collins's repair estimates for the cabinets, roofing shingles, HVAC system, and water lines, which apparently were canned figures he parroted from the 2020 edition of *Contractor's Pricing Guide: Residential Repair & Remodeling* rather than the product of any independent calculations based on the Smiths' specific situation. Doc. 154 at 7-9; Doc. 157-1 at 15, 17, 22-23, 25. Collins admitted at his deposition that he could not explain how those estimates were calculated and that he could not provide a breakdown of the numbers to account for cost of materials, number of person-hours, and labor rate. Doc. 154-1 at 49-50. At first blush, it might appear that this is a valid basis for exclusion.

But in deciding whether to allow that testimony, the court must consider the substantive legal backdrop. Consider the Smiths' contract claim. Under Illinois law, "[t]he measure of damages for the breach of a contract when a contractor has provided defective performance is generally the cost of correcting the defective condition." *Kunkel v. P.K. Dependable Constr., LLC*, 902 N.E.2d 769, 774 (Ill. App. 2009). Moreover, the damages question in such a case can

go to a jury even when there is nothing more in evidence than an *ipse dixit* estimate from an expert in the field. *See id*. at 775 ("An estimate of the cost of repairs by a person qualified in a certain class of work, while not as persuasive as it might be, is nonetheless admissible as a basis upon which a reasonable cost may be determined. [S]uch an opinion, although unsupported by statements of fact, is sufficient to support a finding by the trial court when unopposed by other evidence.") (alteration in original) (citation omitted) (quoting *Marth v. Ill. Weather-Seal, Inc.*, 365 N.E.2d 588, 591 (Ill. App. 1977)).

With this point in mind, it would be a strange result to exclude Collins's damages opinions on the ground that they are not the result of any independent calculations or analysis. NVR does not challenge Collins's qualifications; rightly so, as he appears to have four decades' worth of relevant experience. Doc. 157-1 at 3-4. And *Kunkel* suggests that his say-so would suffice at trial to prove damages under Illinois law. Moreover, what Collins offers here is not *just* his say-so, but rather a standard manual that, he explains, is commonly used in the field. *Id*. at 15, 17, 22-23, 25. So while the lack of any detail in calculating the damages estimates may appear concerning, an opinion based on figures found in the manual is still the product of "sufficient facts or data." Fed. R. Evid. 702(b). It would be wrong to treat the basis for Collins's opinion—the manual—as "[in]sufficient" for purposes of Rule 702 when Illinois law apparently treats it as "sufficient," *Kunkel*, 902 N.E.2d at 775.

Accordingly, NVR's motion to exclude Collins's damages opinions is denied.

## B. Collins's Construction Deficiency Opinions

NVR also challenges Collins's opinions regarding NVR's allegedly deficient construction of the water lines, HVAC system, roofing shingles, and cabinets—but not of the floor framing.

### 1. Water Lines

NVR argues that Collins "utilized an incorrect methodology" in calculating the proper size of the water supply lines. Doc. 154 at 11. Rather than calculate the number of hot water fixtures and cold water fixtures separately, Collins calculated only the total number of fixtures, which he admitted could lead to an incorrect opinion about the lines' proper sizing. Doc. 154-1 at 17. NVR is right that, by making this error, Collins failed to "reliably apply" the relevant principles and methods in calculating the proper size of the water supply lines. Doc. 154 at 11; *see* Fed. R. Evid. 702(c)-(d).

Collins also opined that the size of the water lines installed by NVR would "impact[] water pressure and the availability of hot water at remote faucets and spigots." Doc. 157-1 at 23. But he admitted at his deposition that his sole method of measuring water pressure was putting his hand under a running faucet. Doc. 154-1 at 18. That is hardly one of the "reliable principles and methods" contemplated by Rule 702. *See* Fed. R. Evid. 702(c).

The Smiths' only response on these fronts is that NVR's expert, James Badea, designed the water supply system for the Smiths' home and that his design called for wider water lines than those installed by NVR. Doc. 164 at 11. But that is irrelevant because, as Badea testified, the diagram cited by the Smiths is "'just a schematic' that does not indicate the sizing of a water line in any particular location." Doc. 166 at 6 (quoting Doc. 166-1 at 5). The court therefore excludes Collins's opinion on the construction deficiencies of the water lines.

### 2. HVAC System

NVR next challenges Collins's opinion concerning the alleged deficiencies in the HVAC system. As NVR sees it, Collins's opinion is based not on data or standard methodologies, but rather entirely on hearsay statements from Paul. Doc. 154 at 13; *see* Doc. 154-1 at 24 ("It would

get into the 90s during the summertime and in the 60s in the wintertime, so, therefore, the system was not providing the minimum requirements that the code requires … .").  And Collins testified at his deposition that he had no opinion on whether the calculations used in designing the Smiths' HVAC system complied with the applicable building code.  Doc. 154-1 at 24-25.

Collins's opinion regarding the HVAC system is not based on a reliable (or any) methodology, and it offers nothing beyond what Paul himself can testify to.  If the basis for the Smiths' allegation about the HVAC system is that they suffer extreme temperatures in their home, they can offer that evidence in the form of percipient testimony.  There is no sound basis to smuggle it in as hearsay in the guise of expert opinion.  NVR's motion to exclude is therefore granted as to Collins's opinion on the construction deficiencies of the HVAC system.

### 3.    Roofing Shingles

NVR argues that the court should exclude Collins's opinion on the roofing shingles because the 25-year shingles that NVR installed have already been replaced with 30-year shingles at no cost to the Smiths.  Doc. 154 at 12.  The crux of NVR's argument sounds in the merits question of whether NVR's error in installing 25-year shingles *damaged* the Smiths; it is not an attack on Collins's views on the material differences between the 25-year and the 30-year shingles.  As Collins notes in his report, "[t]he replacement of the shingles does not change my opinion because my opinion is based on the difference in quality between the … 25[-] and 30-year shingles, and not … events subsequent to the Smith's purchase of the home."  Doc. 157-1 at 17.  NVR's motion to exclude is therefore denied as to Collins's opinion regarding the shingles. The merits question regarding damages is addressed below in the court's discussion of NVR's summary judgment motion.

### 4. Cabinets

NVR argues that the court should exclude Collins's opinion "on alleged deficiencies of the cabinets," Doc. 154 at 12 (capitalization altered), but its arguments relate only to the damages opinion issue addressed above, *id*. at 12-13 ("Collins conceded that [his] … replacement cost estimate … was not based on any price sheets or contractor estimates, but instead was a preliminary ballpark figure he derived from someone else's publication."), and the merits question of whether the Smiths reasonably believed the cabinets would be solid wood, *id*. at 12 ("Despite physically inspecting the actual cabinet doors in the process of selecting their cabinets, Plaintiffs contend that Ryan Homes somehow impliedly conveyed, in their mind, that it would supply solid maple wood cabinets. Collins conceded that he would expect to see a veneer cabinet for a lower-priced home.") (citation omitted). Therefore, the court will not exclude Collins's opinion on the alleged construction deficiencies in the cabinets.

\*   \*   \*

In sum, NVR's motion to exclude Collins's opinions is granted as to his liability opinions on the structural deficiencies of the water lines and the HVAC system, and is otherwise denied.

## II. NVR's Summary Judgment Motion

NVR argues that summary judgment should be granted on all of the Smiths' claims because they cannot proceed without Collins's damages opinions. Doc. 147 at 5-6. Because the court denies NVR's motion to exclude Collins's damages opinions, NVR's one-fell-swoop argument for summary judgment fails. NVR puts forth other arguments for why it is entitled to summary judgment on the Smiths' claims regarding the HVAC system, water lines, cabinets, and roofing shingles—but not their claims regarding the floor framing. Those arguments are addressed in turn.

### A.    HVAC System and Water Lines

NVR argues that the Smiths' claims "relating to the water lines and HVAC system fail as a matter of law if … th[e] Court finds that Collins' opinions are not supported by standard and required methodologies." *Id*. at 6.  This is so, argues NVR, "due to the lack of admissible expert testimony of a construction deficiency." *Ibid*.

NVR is correct: the Smiths adduce no other record evidence that could support a finding that the HVAC system and water lines are deficient.  In any event, by failing to address the point in their summary judgment opposition, the Smiths have forfeited any argument that there might be a triable fact as to such deficiencies if, as the court just held, Collins's opinions on those matters are excluded*.  See Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Domka v. Portage Cnty.*, 523 F.3d 776, 783 (7th Cir. 2008) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered.") (internal quotation marks omitted).  Accordingly, NVR is granted summary judgment on the Smiths' HVAC system and water line contract claims.

### B.    Cabinets

The Smiths' ICFA and contract claims concerning the cabinets rest on the allegation that the cabinets were supposed to be solid wood.  Doc. 148 at ¶ 25; Doc. 162 at p. 7.  The parties agree that the cabinets NVR installed were not solid wood.  Doc. 148 at ¶ 37; Doc. 162 at p. 9.

### 1.    ICFA Claim

To succeed on an ICFA claim, a plaintiff must show that: "(1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff

occurred; and (5) the damage complained of was proximately caused by the deception." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005) (citing *Capiccioni v. Brennan Naperville, Inc.*, 791 N.E.2d 553, 558 (Ill. App. 2003)). For purposes of the ICFA, an act or practice is deceptive "if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001) (citing *People ex rel. Hartigan v. Knecht Servs., Inc.*, 575 N.E.2d 1378, 1387 (Ill. App. 1991)). The gist of the Smiths' ICFA claim is that NVR's Included Features brochure, along with representations made by its sales representatives, deceived them into believing that their cabinets would be made of solid wood. 2018 WL 6335051, at *2; Doc. 46 at ¶¶ 13-14; Doc. 62 at 9-10; Doc. 162 at p. 15. NVR does not dispute the contents of the brochure or that the alleged representations were made. Instead, it offers four grounds for why the Smiths' ICFA claim nonetheless fails as a matter of law. None persuades.

*First*, NVR points out that neither its sales representatives nor the Included Features brochure ever used the phrases "solid wood," "all wood," or "solid maple wood," and notes that the Smiths "admit that they physically inspected samples of the cabinet doors on multiple occasions in the course of making their design choices." Doc. 147 at 8 (emphasis omitted). In NVR's view, these facts mean that the Smiths "cannot establish a genuine issue of fact that [NVR] engaged in any 'act or practice' that created a 'likelihood of deception' or had the 'capacity to deceive.'" *Ibid*. NVR's conclusion does not follow from its premises. While an explicit representation that the cabinets were made of solid wood surely would give rise to an ICFA claim, the lack of any such representation does not mean that no ICFA claim can lie. The question here, as in all ICFA cases, is whether a "reasonable consumer" would have been deceived, and in making that determination, "the allegedly deceptive act must be looked upon in light of the *totality of the information* made available to the plaintiff." *Benson v. Fannie May*

*Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (emphasis added) (internal quotation marks omitted). And while the Smiths may have inspected samples of the cabinet doors, the question of what conclusions a reasonable consumer ought to have drawn from such an inspection is a material fact in genuine dispute.

*Second*, NVR contends that the brochure's statement that the default cabinets were "natural oak" could not possibly have contributed to any deception because the Smiths upgraded to the "Sonoma maple espresso" cabinets. Doc. 147 at 9. But the description of the default-choice cabinets as "natural oak" was part of the mix of information available to the Smiths, and there is a genuine dispute as to whether that description—in light of all the other information available—caused the Smiths to believe that their upgraded cabinets would be made of solid wood as well. It is up to the factfinder at trial to determine whether the Smiths so believed and, if so, whether their belief was reasonable. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) ("A label is deceptive if it is likely to mislead a reasonable consumer in a material respect, even if it is not literally false. This determination of the likelihood of deception is an impressionistic one more closely akin to a finding of fact than a conclusion of law.") (citations and internal quotation marks omitted).

*Third*, NVR argues that the cabinet selection form's use of the header "Color Selections," together with the fact that the list included options like "cherry Bordeaux" and "linen," ought to have negated any belief on the Smiths' part that the listed options were species of wood, let alone that the cabinets would be made of solid wood. Doc. 147 at 9-10. That conclusion cannot be drawn as a matter of law. It is not obvious that a reasonable consumer would recognize that most of the listed options are not species of wood, nor is it obvious that a reasonable consumer

could not have thought—again, in light of the total mix of information available—that the listed "Color[s]" were varieties of finishes on solid wood cabinets.

*Fourth*, NVR points to a discrepancy between the cost of the upgrade to the Sonoma cabinets ($4,790) and the Smiths' estimate of cabinet repair costs (north of $20,000). *Ibid*. NVR argues, "[b]ased on simple math," that "a reasonable consumer would not be under a false impression that a modest cabinet upgrade, to the 'Sonoma' style of cabinets in a 'maple espresso' color, would result in solid wood maple cabinets that cost as much as six times more than the upgrade." *Ibid*. (emphasis omitted). But *post hoc* repair costs—of which the Smiths would not have been aware at the time they bought the home—do not bear on whether reasonable consumers would have believed that they were purchasing solid wood cabinets.

In sum, NVR's summary judgment motion is denied as to the Smiths' ICFA claim concerning the cabinets, which may proceed to trial.

### 2. Contract Claim

NVR argues that the Smiths' cabinet-related contract claim fails because the Purchase Agreement "does not make any reference … to the composition of the materials used for the cabinets." Doc. 147 at 11. The Smiths do not address this argument in their opposition brief; they contend only that "the Purchase Agreement does not bar [the Smiths'] [ICFA] claims," but say nothing about their contract claim. Doc. 161 at 10-11 (capitalization altered). The Smiths have therefore forfeited their claim that NVR's installation of wood-veneer cabinets was a breach of contract. *See Nichols*, 755 F.3d at 600; *Domka*, 523 F.3d at 783. NVR's summary judgment motion as to this claim is granted.

### C. Roofing Shingles

The Smiths' contract and ICFA claims concerning the roofing shingles rest on NVR's installation of 25-year shingles despite the Included Features brochure's representation that 30-

year shingles would be used.  NVR argues that the Smiths cannot recover on either claim because the homeowners' association replaced the 25-year shingles with 30-year shingles at no cost to the Smiths and under circumstances unrelated to the alleged construction deficiency. Doc. 147 at 7.  (The parties' Local Rule 56.1 statements and responses, Docs. 148, 151, 160, 162, 168, 170, do not explain why the homeowners' association replaced the Smiths' roofing shingles, but NVR's brief suggests it was due to a windstorm, Doc. 166 at 8, and the Smiths do not argue otherwise.)  Damages is an element of both claims, so NVR argues that the roofing shingles claims fail, as any error it made during construction turned out in the end to cost the Smiths nothing.

The Smiths do not contest these premises, but retort that the collateral source rule nonetheless entitles them to recover.  Doc. 161 at 8; Doc. 164 at 10.  "Under the collateral source rule, benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor." *Arthur v. Catour*, 833 N.E.2d 847, 851 (Ill. 2005) (internal quotation marks omitted).  The rationale for the rule "is that the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contracts or other relations that may exist between the injured party and third persons."  *Wilson v. Hoffman Grp., Inc.*, 546 N.E.2d 524, 530 (Ill. 1989).  Thus, "[a] situation in which courts frequently apply the collateral source rule is where the defendant seeks a reduction of damages because the plaintiff has received insurance benefits that partly or wholly indemnifies the plaintiff for the loss."  *Arthur*, 833 N.E.2d at 852.

The Smiths contend that, under the collateral source rule, they are entitled to recover for the contractual breach irrespective of the homeowners' association's installation of 30-year shingles.  Doc. 161 at 6.  NVR responds that the collateral source rule applies only when the

reason the third party made the plaintiff whole relates to the defendant's conduct—for example,

when an auto insurer pays for a plaintiff's car repairs made necessary by the defendant's

negligence. Doc. 166 at 8-9; Doc. 167 at 6. As NVR sees it, where, as here, the plaintiff's

recovery was due to an "intervening and superseding event … unrelated to the alleged

wrongdoing," the collateral source rule does not apply and the plaintiff gets no double recovery.

Doc. 166 at 8-9 (emphasis omitted). In so arguing, NVR invokes *Starr Indemnity & Liability

Co. v. Technology Insurance Co.*, 379 F. Supp. 3d 723 (N.D. Ill. 2019), which observed that

"courts generally only apply [the collateral source doctrine] where 'the payment by the collateral

source would not have been made "but for" the injury caused by the tortfeasor.'" *Id.* at 731

(quoting *Atmel Corp. v. St. Paul Fire & Marine Ins. Co.*, 430 F. Supp. 2d 984, 987 (N.D. Cal.

2006)). Neither party cites any precedent from Illinois state courts speaking to the question.

      *Starr Indemnity* is persuasive, but in any event the court sides with NVR because the

Smiths, again, wholly fail to contest the matter. *See Nichols*, 755 F.3d at 600; *Domka*, 523 F.3d

at 783. All that the Smiths have to say is that "[t]he collateral source rule applies in contract

cases when there is an element of fraud, tort, or willful and wanton conduct," Doc. 164 at 10, and

that it must therefore apply here "because Counts I and II of the Amended Complaint sound in

fraud," Doc. 161 at 8 (internal quotation marks omitted). But the authority cited by the Smiths

supports only the notion that the collateral source rule *can* apply in certain contract cases. *See

Otto Baum Co. v. Süd Fam. L.P.*, 159 N.E.3d 444, 453 (Ill. App. 2020) ("The collateral-source

rule generally applies in tort cases. The rule applies in contract cases only where there is an

element of fraud, tort, or willful and wanton conduct.") (citation omitted). In other words, the

principle upon which the Smiths rely is a *limitation* on the rule's applicability in contract cases,

not an *expansion* of the rule that would allow for double recovery in fraud-based contract cases even when the collateral source's payment is unrelated to the defendant's conduct.

Because the collateral source rule does not apply here, the installation of new, 30-year shingles at no cost to the Smiths extinguished their claims arising out of NVR's allegedly improper installation of 25-year shingles. NVR is granted summary judgment on those claims.

## III.     The Smiths' Motion for Partial Summary Judgment

The Smiths seek summary judgment on their contract claims concerning the floor framing and the HVAC system. Doc. 149; Doc. 150 at 1. The court has granted summary judgment to NVR on the HVAC claim, which necessarily means that the Smiths are not entitled to summary judgment on that claim. As to the floor framing claim, the Smiths ask the court to find that the floor framing NVR installed in the Smiths' home did not comply with the plans it submitted to the Village. Doc. 149 at ¶¶ 1, 3-4; Doc. 150 at 1.

Under Civil Rule 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The Smiths' motion concerns a breach of contract claim, the elements of which are: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015). Although whether NVR "failed to construct the … floor framing to the Plans and Specifications," Doc. 149 at ¶ 4; Doc. 150 at 1 (capitalization altered), sounds more like a question of fact than a question of law, the Smiths appear to seek partial summary judgment as to the breach element of their claim, *id*. at 7 ("Defendant breached the Purchase Agreement, and the Court may decide that issue as a matter of law … ."). The court therefore construes the Smiths' motion as seeking partial summary judgment on the breach element of their floor framing contract claim.

As the court noted in an earlier opinion, although "the Purchase Agreement provides that the home would be constructed as shown on the 'Plans and Specifications,'" it also "reserves for NVR 'the right to substitute similar materials of substantially equivalent quality' and to make changes 'for purposes of mechanical installations, building code and site requirements, and reasonable architectural design improvements.'"  2018 WL 6335051, at *6 (quoting Doc. 58-1 at 2, 5).  In other words, NVR's deviation from the Plans and Specifications does not *itself* constitute a breach; the Smiths must *also* show that NVR's replacement materials were not of substantially equivalent quality and that the deviation was not for one of the three purposes enumerated in the Purchase Agreement.  NVR admits that it deviated from the Plans and Specifications, Doc. 160 at ¶¶ 26, 28, 30, but it contests that its deviations constituted a breach, Doc. 159 at 10-11.  Because there remain genuine factual disputes as to whether the materials NVR used were of substantially equivalent quality, the court cannot rule as a matter of law that NVR breached the contract.  Accordingly, the Smiths' motion for partial summary judgment is denied.

It is not a total loss for the Smiths, however, as the court has the authority under Rule 56(g) to "enter an order stating any material fact … that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).  Pursuant to Rule 56(g) and NVR's concessions, the court will treat as established that the floor framing NVR installed in the Smiths' home deviated from what appeared in the Plans and Specifications incorporated into the Purchase Agreement.  But the question whether NVR used materials of substantially equivalent quality—and thus the question whether it breached the contract—must be resolved at trial.

**Conclusion**

NVR's motion to exclude Collins's opinions is granted in part and denied in part. Collins's opinions regarding structural deficiencies of the water lines and the HVAC system are excluded. NVR's summary judgment motion is granted in part and denied in part, and the Smiths' motion for partial summary judgment is denied. This case will proceed to trial on the Smiths' claims that (1) NVR breached the Purchase Agreement by installing an improper floor framing system, and (2) NVR's installation of wood veneer cabinets, rather than solid wood cabinets, violated the ICFA.

April 16, 2021

_____
United States District Judge